NUMBER 13-02-589-CV

 

                         COURT OF APPEALS

 

                     THIRTEENTH
DISTRICT OF TEXAS

 

                         CORPUS
CHRISTI - EDINBURG

 

WILLIAM C. COCKE, ET AL.,                                                       Appellants,

 

                                                             v.                                

 

E. PAUL SCHEXNAILDER, ET AL.,                                                Appellees.

 

       On
appeal from the 28th District Court of Nueces County, Texas.

 

 

                               MEMORANDUM
OPINION

 

                       Before
Justices Hinojosa, Yañez, and Castillo

                            Memorandum
Opinion by Justice Yañez

 








Appellant, William C. Cocke,[1]
challenges the trial court=s granting of summary judgment in favor of
appellees, E. Paul Schexnailder,[2]
Chase Bank,[3]
Asset Development Corporation, and Seashore Properties, Inc.  Appellant also contends the trial court erred
in denying his motion for new trial.  We
affirm.

                                                                  Background


In the 1990's, appellant entered into a business
agreement with Schexnailder and C. Bert Williams[4]
to form Seashore Properties, Inc., for the purpose of developing property on
North Padre Island.  A dispute arose and
in 1996, appellant brought a shareholder derivative suit[5]
(Athe underlying litigation@) against appellees. 

After extensive litigation, the parties mediated
their dispute and reached a settlement on February 4, 1998.  The written settlement agreement (Athe Agreement@)  provided
for appellees to transfer to appellant, on or before March 6, 1998,
$300,000.00, all outstanding shares of stock in Seashore Properties, Inc., and
the deed to approximately 356 acres of the property, in exchange for the
release of all pending claims and the existing lis pendens, and
appellant=s promise to perform certain environmental
mitigation work under a U.S. Army Corps of Engineers Permit.  








On March 13, 1998, appellant delivered a letter to
appellees demanding their tender of performance under the Agreement.  On March 16, 1998, appellees filed with the
Registry of the Court the $300,000.00, documents, and the deed called for in
the Agreement.  Also on March 16, 1998,
appellees filed a AMotion to Approve,[6]
Administer, and Enforce Settlement Agreement,@ which
requested that the court maintain jurisdiction over the Agreement and supervise
appellant=s performance of his mitigation duties under the
Agreement.  Appellees also argued that
pursuant to the Agreement, they had delivered drafts of additional settlement
documents to appellant, but that appellant had refused to sign such documents.

On April 27, 1998, appellant filed a AThird Supplemental Petition@ and a AMotion  for
Declaratory Judgment and Approval and Enforcement of Settlement Agreement,@ both of which requested Aspecific performance@ of
the Agreement.  Appellant=s motion for declaratory judgment alleged that
appellees had failed to comply with the Agreement in several respects,
including (1) improperly tendering performance with the court rather than to
appellant directly, and (2) adding Anew special and unagreed to conditions@ to the deed of the property to be transferred to
appellant.  Appellant argues that by
adding such conditions, appellees have attempted to transfer their mitigation
duties on the remainder of appellees= property to appellant.  Appellant argues that under the Agreement, he
is responsible only for mitigation of up to six acres of seagrass habitat, and
that any other mitigation requirements set forth in the Army Corps of Engineers
permit remain the responsibility of appellees. 








In light of the parties= dispute regarding the terms of the Agreement, on
May 1, 1998, the trial court referred the parties to a Special Master for interpretation
of the Agreement.  The Special Master
filed a report on June 16, 1998.  The
Special Master found that the Agreement requires appellant to assume all
obligations for environmental mitigation related to the property as set forth
in the Army Corps of Engineers permit.[7]  The report further states:

In the instant case, should the Court order
[appellees] to tender performance before the [appellant] completes mitigation,
the Court would indeed run the risk that [appellant] would refuse to
perform.  In this connection, the
evidence clearly indicates [appellant] does not consider himself responsible
for doing the mitigation required by Permit 9009(10); however, he has Ano problem@ and is willing to do up to six acres of the
mitigation or pay 25% of the cost.  Were
it not for [appellant=s] efforts to avoid this mitigation obligation, I
would be more compelled to order immediate transfer.  Under its inherent power, the Court may
choose to supervise the terms of the settlement and require performance by
[appellant] before requiring performance by [appellees] for this reason.  It is anticipated that I will have to
supplement my report after final closing documents are presented to the Court
for approval.  

 

The report also advised the court to approve the
Agreement.    

 








On June 17, 1998, the trial court held a hearing
concerning the Special Master=s report.  The
court conditionally approved the settlement, ordered the transfer of the real
property and stocks to be held in escrow, and ordered the $300,000 to be held
in the court=s registry. 
The court ordered appellant to do the mitigation as required by the
permit.  The court stated that after
appellant completed the mitigation in accordance with the  specifications of the Corps of Engineers, the
deeds would be transferred to appellant. 
At the hearing, appellees noted their concern that appellant may attempt
to avoid his mitigation obligations under the settlement agreement.  Appellees asked the court to require
appellant=s performance under the Agreement before requiring
performance by appellees.  Appellant=s counsel expressed concern that appellant may be
unable to perform the mitigation work without a Corps of Engineers permit in
his own name.   

Following a second hearing on July 9, 1998, the
parties reached agreement on an order conditionally approving the Agreement.[8]   The order stated:

On June 18, 1998, came to be heard the Motion for
Declaratory Judgment and Approval and Enforcement of Settlement Agreement filed
by the Plaintiff, William C. Cocke, and the Motion to Approve, Administer and
Enforce Settlement Agreement filed by the Defendants.  All parties appeared by and through their
respective attorneys of record.

 

The Court, after considering the matters of record
in this cause, the Report of Special Master Nebrat, including the findings
contained therein, the argument of counsel and other pertinent matters, ACCEPTS
the Report of Special Master Nebrat filed herein and FINDS that the Settlement
Agreement dated February 4, 1998 and entered into by the parties, a copy of
which is attached hereto as Exhibit 1 and the terms of which are incorporated
into this Order by reference, is fair, adequate and reasonable, and in the best
interests of Seashore Properties, Inc., and it is hereby APPROVED with the
conditions set forth herein below.  

  








In accordance with Rule 42 of the Texas Rules of
Civil Procedure and under applicable Texas law, the Court further FINDS that
good cause exists to continue jurisdiction of this case.

 

The Court orders immediate transfer of real property
and stocks to the Court and orders $300,000 to be placed in the registry of the
Court.  Plaintiffs may petition for
attorney fees and costs of mitigation. 
The Court will administer the settlement until complete.  The Court finds that Plaintiff is responsible
for mitigation.  The Court will release
deeds to Plaintiff upon completion of mitigation and approval of the U.S. Army
Corps of Engineers under Permit 9009(10). 
Deeds are to be simple; transferring ownership to Plaintiff Cocke.

 

The parties are ordered to cooperate in the drafting
and execution of final settlement documents accomplishing the terms of the
agreement and this order.  The Court
Master may assist the parties in this regard.        

 

At the conclusion of a hearing on July 15, 1998,
appellees agreed to authorize the Asplitting@ of the permit with such authorization to be held in
escrow by the trial court until such time that appellant has timely completed
the mitigation work to the satisfaction of the Corps of Engineers.  Thereafter, the trial court released $150,000
of the $300,000 in the court=s registry for appellant=s use in performing the mitigation work.  Appellant hired a contractor and work began
on the mitigation required under the permit. 
Following a subsequent hearing on September 2, 1998, the trial court
released the remaining $150,000 for continuation of the mitigation work.[9]  








On September 29, 1998, appellant notified the trial
court that the mitigation work was complete and had been certified by Clem
Williams (appellant=s engineer in charge of the mitigation) and
submitted to the Corps of Engineers for approval.  In a letter to Schexnailder dated September
30, 1998, Schexnailder=s engineer advised that there were Afive substantial items of non-compliance@ regarding the mitigation work.  In early November, 1998, Schexnailder
received a letter from Fred Anthamatten of the Corps of Engineers, which
expressed several concerns, including  A that the seagrass area may be too deep for seagrass
development and survival@ and Athat the pond is not deep enough to discourage the
establishment of noxious vegetation.@  The letter
further notes several Amodifications@ to the permit plans, which the Corps had approved
based on the assumption that Schexnailder was aware of the requests.[10]  

On November 18, 1998, appellant filed a Supplemental
Status Report, which included a copy of a letter from Williams to the Corps in
response to the comments regarding seagrass development and the pond.  The letter notes that (1) the seagrass
elevations were selected on the basis of a nearby successful seagrass
mitigation site and (2) the other items mentioned are not components of the
success criteria for habitat development requirements under the permit. 

On November 19, 1998, appellees filed a Joint Motion
to Declare Default and Breach of the Settlement Agreement, in which they
alleged that appellant breached the Agreement by failing to properly perform
the habitat construction work.  In
support of his argument that the construction was performed properly, appellant
relies on a letter addressed to his counsel dated November 19, 1998, from Janet
Thomas of the Corps of Engineers.  The
letter states, in pertinent part:








In your letter [from appellant=s counsel dated November 16, 1998], you asked
whether or not the Corps considered the constructed mitigation, as it stands to
date, satisfactory.  As you know, we
previously noted several discrepancies in the details of the habitat
construction.  However, we are satisfied
with the current construction effort and are ready to continue monitoring the
success of the mitigation area.  We may
need to make future changes to the site, as needed prior to making a final
determination as to site success.

 

You also asked if the Corps was willing, at this
time, to transfer portions of Department of the Army Permit 9009(10) from Mr.
Paul Schexnailder to Mr. Bill Cocke.  As
previously noted, the Corps initiates transfer of all, or portions of, a permit
based on the request from the permittee. 
Therefore, for this action to occur the Corps only needs the permittee
to request the transfer and the recipient to accept.  

 

On December 18, 1998, appellant filed a Motion for
Final Closing, Release of Documents, and Final Adjudication, contending that
the habitat construction had been completed to the satisfaction of the Corps.[11]  The same day, December 18, 1998, appellees
filed a Motion for Referral to the Special Master, contending that appellant
had breached the Agreement by failing to perform the environmental mitigation
required under the permit.  Following a
hearing, the trial court signed an order dated January 13, 1998,[12]
appointing Special Master Nebrat to determine whether appellant had breached
the Agreement.             

The Special Master held hearings on January 20,
1999, February 14, 1999, and July 27, 1999. 
The Special Master=s second report addressed the following questions:

(a) Did [appellant] breach the February 4, 1998
Settlement Agreement between the parties as interpreted and approved by the
Court?

 








(b) Did [appellant] substantially perform[13]
his obligations under the February 4, 1998 Settlement Agreement as interpreted
and approved by the Court?

 

The report stated, in pertinent part:

 

3.  Evidence

 

In determining the questions, I considered the
testimony and documentary evidence attached hereto as PX Nos. 1-18 and DX Nos.
1-41.  The record is replete with
evidence that is conflicting. 
Furthermore, the testimony by representatives of the Army Corps of Engineers
created a great deal of confusion in their characterization of whether or not
they approved Plaintiff=s mitigation work. 
ATerms of art@ well known to the Corps were not as familiar, if at
all, to the parties and the Special Master.

 

The evidence is clear that the Corps could not Aapprove@ or make a final determination that the requirements
of the Permit were completed on September 30, 1998, until the success criteria
issues are resolved.  It is unclear if
the parties or the Court were aware of this fact on July 9, 1998, at which time
the Court entered its Order.  While a letter
from the Corps indicates the habitat to be constructed under Permit No.
9009(10), except for sea grass, is Abeyond what is required by the Permit,@ the evidence is also clear that certain aspects of
the Habitat Construction are in non-compliance.

 

Notwithstanding the foregoing evidence, the greater
weight and preponderance of the evidence demonstrates that the Corps is Asatisfied@ with the Plaintiff=s
efforts to date.  While such language
falls short of Aapproval,@ and points out aspects of non-compliance, it still
favors an overall Asatisfaction@ scenario.

 

 

4.  Findings

 

(a) I find that Plaintiff is in breach of the
Settlement Agreement as interpreted and approved by the Court.

 








(b) I find that certain aspects of the mitigation
which are in non-compliance are not so pervasive and material that they cannot
be remedied.  Accordingly, I find that
Plaintiff substantially performed his obligations under the Settlement
Agreement as interpreted and approved by the Court.  The cost, if any, to remedy those aspects of
non-compliance that require remedial measures to cure should remain the
obligation of Plaintiff as part of his mitigation undertaking, without
limitation.

 

On July 27, 1999, appellees filed a First Amended
Counterclaim for Default and Breach of Settlement Agreement, alleging that
appellant (1) breached the Agreement by failing to satisfactorily perform the
habitat construction work and (2) engaged in fraudulent misrepresentations
regarding the role of the Corps in the habitat construction work.  On August 2, 1999, appellant generally denied
appellees= claims, pled substantial performance, and pled that
appellees breached the Agreement by acting in bad faith and  interfering with appellant=s ability to complete the mitigation work.  On October 29, 1999, appellant filed a
supplemental petition, alleging that appellees breached the Agreement and that
appellees fraudulently induced him into the Agreement.  On December 17, 1999, appellees responded to
appellant=s claims, asserting defenses and affirmative
defenses, including ratification, waiver, estoppel and/or laches, and that
appellant=s claims are barred by appellant=s own negligence and unreasonable conduct.   

On December 10, 1999, appellant filed a Motion for
Disapproval of the Settlement Agreement, in which he (1) argues he cannot
complete the mitigation work because appellees have withdrawn their
authorization for him to communicate with the Corps and (2) urges the court to
set aside the Agreement and set the case for trial.  

                                    Motions
for Summary Judgment 








Appellees filed five motions for summary judgment:
three claiming entitlement to judgment on their own breach-of-contract claims
and two addressing appellant=s fraudulent inducement and breach-of-contract
claims.  We briefly describe each of appellees= motions.

                                             Appellees= Breach-of-Contract Claims

                                                                     Motion
#1

On November 18, 1999, appellees filed a Motion for
Partial Summary Judgment on their breach-of-contract claim against
appellant.  Appellees attached as
evidence various documents, including a June 4, 1999 letter from the Corps,
which stated, in pertinent part:

As you know, we continue to evaluate the recently
constructed mitigation site for the subject permit.  As previously stated, we are currently
satisfied with the construction of the seagrass habitat associated with the
mitigation site.  However, a full
compliance determination can not be made until such time, as specified in the
permit, the seagrass habitat has had an opportunity to vegetate.

 

In compliance with our recent request, Shiner,
Mosely and Associates, Incorporated provided us with a post-construction survey
of the mitigation site.  Based on our
review of the survey, we find that the other aspects of the required mitigation
site are not in compliance with the requirements of the subject permit.  We have identified significant differences
between the required and constructed acreage for both the sand flat and upland
habitats.  We have identified these habitats,
in consultation with the U.S. Fish and Wildlife Service (FWS), as important
resources for the Piping Plover, which is listed as a AThreatened@ species in this region.  As such, we find that these differences may
constitute an adverse impact to this species. 
We expect to begin Informal Consultation Procedures with the FWS in the
near future.

 

Based on the non-compliant status, we will
coordinate a meeting with you and the FWS, in the near future, to determine the
necessary measures needed to correct the issues.  

 

 

 

Appellees also attached a second letter from the
Corps, dated September 27, 1999,  which
stated, in pertinent part:








Based on our first assessment of the constructed
mitigation area, we found that the acreage constructed for each habitat type
was not in compliance with the permitted plans. 
Focusing on the basic premise of the mitigation area, our initial
concern was the success of the seagrass habitat.  We had no information as to the potential
impact the acreage differences might have on the piping plover.  Therefore, we found that the appropriate
course of action, at that time, was to continue monitoring the seagrass and to
reserve our approval until the appropriate time, as stipulated in the permit.

 

. . . .

 

Based on the information above, we have determined
that the mitigation area is not in compliance with the permitted plans and that
the area does not function to meet the basic premise.  Therefore, we are requiring you to redesign
the mitigation area . . . 

 

                                                         Motion
#2

 

On December 30, 1999, appellees filed a Joint
Supplemental Motion for Partial Summary Judgment on their breach-of-contract
claim against appellant.  In the motion,
appellees complained of appellant=s failure to release the lis pendens against
the property in accordance with the Agreement. 
In the motion, appellees argue that appellant=s failure to release the lis pendens pursuant
to the settlement of his underlying claims constitutes a breach of the
Agreement.  A copy of the Notice of Lis
Pendens was attached to appellees= motion.

                                                         Motion
#3

On November 17, 2000, appellees filed a Second
Supplemental Motion for Summary Judgment on their breach-of-contract claim
against appellant.  In the motion,
appellees argue that correspondence from the Corps establishes that appellant
failed to satisfactorily perform the mitigation work required under the permit
and therefore breached the Agreement.  In
support, appellees attached various correspondence, including the
following:  








(1) a January 26, 2000 letter from the Corps
stating, Awe have determined that the mitigation area,
approved under the subject permit, was not performed in compliance with the
approved plans.@  The letter
also notes that A[t]he pond, as constructed, is not in compliance
with the original permit.@ 

 

(2) an April 27, 2000 letter from the Corps stating,


 

[s]ince we did not have any construction plans [from
appellant], we could not have approved them. . . . We do not supervise
construction, as this is the responsibility of the permittee to ensure
compliance.  Of course, it is our
responsibility to determine compliance. 
Finally, we did not, and still have not, approved work performed in the
habitat area.

 

(3) a June 12, 2000 letter from the Corps, stating, A[a]s of now, nothing has really changed since our
last correspondence with Mr. Schexnailder dated April 27, 2000, in which we
stated that the mitigation work was not in compliance with the terms and
conditions of the permit.@

 

(4) a September 8, 2000 letter to Schexnailder from
the Corps, stating,

 

We had a meeting with [appellant] and his consultant
the afternoon of July 21, 2000.  We advised
both you and [appellant] separately, that the project was in violation of the
Endangered Species Act, and we would require, in writing, that the project
design be changed to resolve the violation. . . . We find that the mitigation
directed under Department of the Army Permit 9009(10), was prematurely
constructed without adequate review of the site=s
existing land features, prior to construction, and that the site was
constructed without the Corps= approval of the specific construction plans.  We believe that these actions directly led to
the failure of the habitat to meet the overall premise of the permit
requirements. . . . As such, we believe material changes are needed to develop
a full redesign of the habitat area.

 

With regard to appellant=s claims that he was fraudulently induced into
entering the Agreement and that appellees breached the Agreement, appellees
filed two motions for summary judgment, described as follows.

 

 

                                        Appellant=s Fraudulent Inducement Claims

                                                                     Motion
#4








On December 17, 1999, appellees filed a traditional
and no-evidence motion for summary judgment on appellant=s claims.  In
response to appellant=s claim that he was fraudulently induced into the
Agreement without knowing the scope and nature of the requirements under the
permit, appelles argue that appellant is Aestopped and precluded as a matter of law@ from claiming fraud because (1) the issues relating
to the habitat mitigation were fully discussed at hearings before the Special
Master, (2) the Special Master=s Report established appellant=s obligation to perform the mitigation work Ain the manner and within the time@ prescribed 
under the permit, (3) the court=s July 9, 1998 order accepted and incorporated the
Special Master=s report, and (4) there were no objections to either
the Special Master=s report of June 16, 1998 or the court=s order. 
Appellees argue that on September 2, 1998, appellant represented to the
court that he was proceeding with the habitat mitigation construction work and
on December 18, 1998, represented to the court that the work had been
satisfactorily completed.  In the Ano-evidence@ section of the motion, appellees claim there is no
evidence of various elements of appellant=s claims, including evidence that (1) Schexnailder
is guilty of willful, malicious, and knowing fraud in the inducement of the
Agreement, (2) Schexnailder made any material misrepresentations regarding the
Agreement, (3) Schexnailder intended to and did interfere with the Corps= approval of the work, (4) appellant sustained
damages, and (5) appellees have failed to comply with the terms of the
Agreement. 

 

 

                                                                     Motion
#5








On November 17, 2000, appellees filed a supplemental
motion for summary judgment on appellant=s fraudulent inducement and breach-of-contract
claims.  In the motion, appellees assert
that appellant=s claims are barred by waiver, estoppel, and
ratification.  Attached to the motion are
several documents, including (1) an excerpt from appellant=s position paper dated May 15, 1998, filed with the
Special Master, in which appellant states that he was aware that Schexnailder
re-negotiated the permit with the Corps, but the fact that appellant was aware
of the new requirements should not be taken to mean that he was willing to take
on the mitigation responsibilities of the entire permit; (2) an excerpt from
appellant=s deposition, in which appellant concedes that at
the time of the Agreement, he had not read the terms and conditions of the
permit, but knew that the property he was to receive under the Agreement was
encumbered by the requirements of the permit; (3) an excerpt from the
deposition testimony of Clem Williams, appellant=s
engineer, in which he conceded that appellant understood that it was his
responsibility to  perform the
requirements for habitat construction under the permit; and (4) an excerpt from
the deposition testimony of W.T. Young, appellant=s
contractor on the mitigation project, in which he describes the mitigation work
he performed for appellant.  

Appellant=s
Responses

                                                     January
14, 2000 Response








On January 14, 2000, appellant filed a response to
appellees= motions for summary judgment #s 1, 2, and 4
(appellees= first two motions on their breach-of-contract
claims and their first motion on appellant=s fraudulent inducement claims).  In the response, appellant argues that he was
fraudulently induced into signing the Agreement because at the time of signing,
appellees knew that there were Asubstantial@ changes in the requirements for the permit, and
appellant=s characterization of the changes as minimal constituted
material misrepresentations.  Appellant
contends that appellees= engineer filed a report with the Corps which cast
doubt as to the quality of the work completed by appellant.  Appellant attached various documents to the
response, including (1) the Agreement, (2) the November 19, 1998 letter from
the Corps stating Awe are satisfied with the current construction
effort@ and Amay need to make future changes . . .  prior to making a final determination as to
site success,@ (3) the second Special Master report, (4)
Schexnailder=s deposition testimony, (5) the September 24, 1998
letter from appellant=s engineer reporting 
completion of the habitat work, and (6) appellant=s own affidavit, dated January 11, 2000 (Appellant=s First Affidavit),[14]
in which he states that Schexnailder made material representations which
induced appellant into signing the Agreement, specifically, that Schexnailder
knew at the time of the Agreement that there was a new habitat construction
plan that enlarged the scope of the work. 


                                                   November
30, 2000 Response








Appellant filed a second response to appellees= motions on November 30, 2000.   In the response, appellant objected to the
court=s consideration of appellees= motions on grounds that discovery was not
substantially complete; specifically, appellant complains he had unsuccessfully
sought to take the deposition of Schexnailder=s
engineer, Joe Mosely.  Attached to
appellant=s response were (1) the affidavit of appellant,
dated November 30, 2000 (Appellant=s second affidavit) and the affidavit of his
attorney, David Crago, and (2) the depositions of W. T. Young (appellant=s contractor) and Clem Williams (his engineer).  Appellant=s
affidavit disputes several of appellees= statements about appellant; the affidavit does not
address any fraudulent conduct by Schexnailder. 
In the motion, appellant Acites the deposition of W. T. Young and Clem
Williams in their entirety and under the totality of the circumstances to fully
understand the evolution of the development plans, specification, construction
plans, as built diagrams, and actual construction evolution as completed.@  Accordingly,
appellant does not cite the depositions as evidence of any fraudulent conduct
by Schexnailder.   

                                          Hearing
on Summary Judgment Motions

On December 8, 2000, the trial court held a hearing
on all of appellees= motions for summary judgment.  At the hearing, appellees argued that by
failing to perform the mitigation work to the satisfaction of the Corps,
appellant had materially breached the Agreement and because of appellant=s breach, appellees should be legally excused from
further performance under the Agreement. 
Appellant argued that the result urged by appellees was inequitable and
that the court should Ano longer approve@ the
Agreement[15]
and should Agive [appellant his] lawsuit back.@  The court
noted that it had spoken to the Corps regarding the mitigation.  The court stated

I=m looking at my notes and what I remember them
telling me is that the mitigation that was done was not pursuant to the
permit.  That it wasB it looked like that it was okay but then certain
time passed.  They knew firsthand, and
they knew just by the things that were happening to theB to some species or grass or something, that it had
not been followed as the permit required. 
So, they felt that whoever had done the mitigation did not go by what
was initially permitted for the mitigation part.  So, with that understanding, it seems that
the mitigation was not done the way it should have been done.    








The trial court took the motions under advisement,
and on February 15, 2001, issued an order granting all of appellees= motions.  The
order stated, in pertinent part:

1. [Appellees=] objections to [appellant=s] summary judgment evidence are well taken and are
hereby SUSTAINED.

 

2. [Appellant] materially breached the February 4,
1998, Settlement Agreement between the parties.

 

3. [Appellees] are legally excused from any further
obligations to perform under the February 4, 1998, Settlement Agreement.

 

4. [Appellees=] Motions for Summary Judgment as to the breach of
contract claim against [appellant] are GRANTED.

 

5. [Appellees=] Motions for Summary Judgment as to [appellant=s] claims of fraud, fraudulent inducement and breach
of contract are GRANTED. 

 

Appellant filed several motions for new trial and
reconsideration, alleging, among other things, that newly-discovered evidence
mandated the granting of a new trial.  On
July 25, 2002, the trial court entered a judgment disposing of all claims.[16]  The court ordered appellant=s original claims in his underlying lawsuit
dismissed pursuant to the Agreement

and ordered that appellant take nothing pursuant to
the court=s February 15, 2001 summary judgment order.[17]  








In his first three issues, appellant contends the
trial court erred in granting appellees= motions for summary judgment.  In his fourth issue, appellant complains that
the trial court=s judgment is inequitable because it deprives
appellant of both the benefits of the Agreement and his original lawsuit.  In his fifth issue, appellant contends the
trial court erred in denying his motion for new trial.  

                                                            Standard
of Review               

The standard of review for the grant of a motion for
summary judgment is determined by whether the motion was brought on no‑evidence
or traditional grounds.[18]  We review de novo a trial court's
grant or denial of a traditional motion for summary judgment.[19]  The movant bears the burden of showing both
no genuine issue of material fact and entitlement to judgment as a matter of
law.[20]  In deciding whether there is a genuine issue
of material fact, we take evidence favorable to the non‑movant as true.[21]  We make all reasonable inferences and resolve
all doubts in favor of the non‑movant.[22]









A no‑evidence summary judgment is equivalent
to a pretrial directed verdict, and this Court applies the same legal
sufficiency standard on review.[23]  In an appeal of a no‑evidence summary
judgment, this Court reviews the evidence in the light most favorable to the
nonmovant, disregarding all contrary evidence and inferences.[24]  If the nonmovant produces evidence to raise a
genuine issue of material fact, summary judgment is improper.[25]  All that is required of the non‑movant
is to produce a scintilla of probative evidence to raise a genuine issue of
material fact.[26]  "Less than a scintilla of evidence
exists when the evidence is 'so weak as to do no more than create a mere
surmise or suspicion of a fact.'"[27]  Conversely, more than a scintilla exists when
the evidence "rises to a level that would enable reasonable and fair‑minded
people to differ in their conclusions."[28]  The burden of producing evidence is entirely
on the non‑movant; the movant has no burden to attach any evidence to the
motion.[29]

                                                                      Analysis









In his first two issues, appellant contends the
trial court erred in granting summary judgment in appellees= favor on their breach-of-contract claim.  Appellant contends that there is a genuine
issue of material fact as to whether he breached the Agreement.  In support, appellant points to (1) the
September 24, 1998 letter from his engineer, Clem Williams,  reporting that the construction was complete
under the terms of the permit, (2) Williams=s
deposition testimony that he submitted an as-built drawing indicating that the
construction was complete, (3) Young=s deposition testimony that he timely completed the
construction work, and (4) the November 19, 1998 letter from the Corps, noting Aseveral discrepancies in the details of the habitat
construction,@ but noting Awe are satisfied with the current construction
effort.@  Appellant
argues that whether he timely and satisfactorily performed the mitigation work
should be measured at the deadline for completing the work, September 30,
1998.  Appellant contends that much of
appellees= summary judgment evidence, dated much later than
the date of compliance, cannot establish appellant=s non-compliance.  
Alternatively, appellant argues that the summary judgement evidence
raises  a genuine issue of material fact
as to whether he Asubstantially performed@ under the Agreement.  Appellant argues that his performance of the
mitigation was a Arelatively minor@
portion of the consideration given by appellant under the Agreement.  Appellant also points to the Special Master=s findings that although appellant breached the
Agreement, he Asubstantially performed@ his obligations under the Agreement.  We are unpersuaded by appellant=s arguments.  

We agree with appellees that appellant failed to
produce any evidence that controverted the fact conclusively established by the
Corps= correspondence that the habitat construction work
was not properly performed.  Accordingly,
we conclude that appellees conclusively established the absence of any genuine
question of material fact and their entitlement to judgment as a matter of law.[30]








The elements in a suit for breach of contract are
(1) a valid contract, (2) the plaintiff performed or tendered performance, (3)
the defendant breached the contract, and (4) the plaintiff was damaged as a
result of the breach.[31]  If a contract is unambiguous, the court must
interpret the contract and determine whether a party has breached the contract
as a matter of law.[32]  

Appellant argues that the summary judgment standard
of review requires that we  Agive deference to the Corps statements that it was
satisfied with the construction in the letters of November 19, 1998 [from Janet
Thomas] and June 4, 1999 [from Fred Anthamatten]" and de-emphasize later
Corps correspondence less favorable to appellant=s
position.  According to appellant, the
November 19, 1998 letter is the A[m]ost significant of all the summary judgment
evidence.@  Viewing the
evidence, as we must, in the light most favorable to appellant,[33]
we conclude that even the letters of November 19, 1998 and June 4, 1999
establish that appellant had not completed the mitigation work to the satisfaction
of the Corps by September 30, 1998 and had therefore breached the
Agreement.  The November 19, 1998 letter
refers to Aseveral discrepancies in the details of the habitat
construction@ and notes Afuture changes@ that may be necessary Aprior to making a final determination of site
success.@  The June 4,
1999 letter notes that although the Corps is Acurrently
satisfied@ with the seagrass habitat, Aother aspects of the required mitigation site are
not in compliance with the requirements of the subject permit.@  We conclude
that the summary judgment evidence establishes that appellant breached the
Agreement.  








Appellant also argues summary judgment was improper
because there is a fact issue as to whether he substantially performed under
the Agreement.  Appellant contends that
his agreement to give up his lawsuit, in and of itself, is evidence of
substantial performance of the Agreement and that his performance of the
mitigation was Aa relatively minor portion of [his] consideration.@  We disagree.

If a party has committed a material breach of a
contract, his performance cannot be substantial.[34]  In determining substantial performance, there
must be no wilful departure from the terms of the contract and no omission of
essential points of the project.[35]  The party seeking relief under the doctrine
bears the burden of proving that he did substantially perform in accordance
with the agreement.[36]  One of the most obvious factors to be
considered in determining substantial performance is the extent of the
nonperformance.[37]
The deficiency will not be tolerated if it is so pervasive as to frustrate the
purpose of the contract in any real or substantial sense.[38]


Here, the evidence shows that appellant=s non-performance was so pervasive that it
frustrated the purpose of the Agreement. 
The September 27, 1999 letter from the Corps advised Schexnailder that
because Athe mitigation area is not in compliance with the
permitted plans,@ it was requiring Aredesign
[of] the mitigation area.@  We conclude
that the summary judgment evidence did not raise a genuine issue of material
fact that appellant substantially performed under the Agreement.  We overrule appellant=s first and second issues.  








In his third issue, appellant contends the trial
court erred in granting summary judgment in appellees= favor on appellant=s
claims for fraudulent inducement and breach of contract.  Appellant=s
breach-of-contract claim is based on his contention that appellees breached the
Agreement first by tendering performance to the trial court.  Appellant=s
fraudulent inducement claim is based on his claim that at the time of the
Agreement, Schexnailder knew there were substantial changes in the permit
requirements, but misrepresented the changes as minimal.

Appellees argue that appellant=s express agreement to the trial court=s July 9, 1998, order, which required appellees to
tender performance into the registry of the court, waived any claims that such
tender of performance by appellees breached the Agreement.  We agree. 
Moreover, we conclude that in his responses to appellees= no-evidence motions, appellant offered no evidence
to raise a genuine issue of material fact as to either his breach-of-contract
claim or his fraudulent inducement claim. 

As noted above, appellant=s evidence of fraudulent inducement consisted of his
own affidavit (appellant=s First Affidavit) stating that Schexnailder induced
him into signing the Agreement by misrepresenting the scope of the mitigation
work.  Appellant=s affidavit states that Schexnailder made Amisrepresentations@ that
were Afalse and fraudulent@ by
stating that Athere were no changes in the current permit 9009(10)
from permit 9009(09) except for placing the permit site for all the mitigation
in the 358 acres in question and that there was no requirement of the immediate
planting of sea grasses.@  Appellant
states it was his Aclear understanding@ that
Schexnailder had described all the changes between the two permits.  Appellant states that he later learned there
were additional requirements.    








A summary judgment may be based on the
uncontroverted testimonial evidence of an interested witness if the evidence is
clear, positive, and direct, otherwise credible and free from contradictions
and inconsistencies, and could have been readily controverted.[39]
In addition, affidavits must set forth facts and cannot be conclusory.[40]  ASubjective beliefs@ are
not susceptible to being readily controverted and, therefore, are not competent
summary judgment evidence.[41]  Self‑serving statements of interested
parties, testifying as to what they knew or intended, do not meet the standards
of Texas courts for summary judgment.[42]  Issues of intent and knowledge are not
susceptible to being readily controverted and are inappropriate for summary
judgment.[43]

We conclude that appellant=s First Affidavit contains conclusory statements and
statements as to what the parties knew or understood.  The trial court properly sustained appellees= objections to appellant=s affidavits. 
Accordingly, we conclude the trial court properly granted summary
judgment in appellees= favor on appellant=s
breach-of-contract and fraudulent inducement claims.  We overrule appellant=s third issue. 









In his fourth issue, appellant contends the trial
court erred in allowing appellees to 
terminate the Agreement and their obligations under it and still claim
the benefits of the Agreement.  Appellant
argues that because appellees elected to repudiate the Agreement due to his
alleged breach, the Agreement must be considered rescinded as to both
parties.  According to appellant, the
trial court erred in allowing appellees to keep the deed while dismissing his
underlying lawsuit with prejudice.  

It is a fundamental principle of contract law that
when one party to a contract commits a material breach of that contract, the
other party is discharged or excused from further performance.[44]  The determination of whether a breach is a
material breach of the contract must necessarily turn on the facts of each
case, but the following circumstances influence that decision:

(a) The extent to which the injured party will
obtain the substantial benefit which he could have reasonably anticipated;

 

(b) The extent to which the injured party may be
adequately compensated in damages for lack of complete performance;

 

(c) The extent to which the party failing to perform
has already partly performed or made preparations for performance;

 

(d) The greater or less hardship on the party
failing to perform in terminating the contract;

 

(e) The wilful, negligent or innocent behavior of
the party failing to perform;

 

(f) The greater or less uncertainty that the party
failing to perform will perform the remainder of the contract.[45]

 








Here, the evidence shows that appellees are unlikely
to obtain the benefit they reasonably anticipated.  In the court=s
words, Athe mitigation was not done the way it should have
been done.@  The
September 27, 1999 letter from the Corps advised Schexnailder that because Athe mitigation area is not in compliance with the
permitted plans,@ it was requiring Aredesign
[of] the mitigation area.@  We conclude
that the trial court did not err in finding that appellant materially breached
the Agreement and that appellees were legally excused from further performance
under the Agreement.  We overrule
appellant=s fourth issue. 

In his fifth issue, appellant contends the trial
court abused its discretion in denying his motion for new trial based on
newly-discovered evidence.  Appellant
points to the newly-discovered evidence of (1) the deposition testimony of Joe
Moseley, Schexnailder=s engineer, and (2) the deposition testimony of Fred
Anthamatten.  According to appellant,
Moseley=s deposition testimony establishes that there was a
civil conspiracy between Moseley and Schexnailder to manipulate or fabricate
the Corps= disapproval of the mitigation construction.  Appellant also argues that because
Anthamatten testified that the only approval the Corps can give on construction
work is Afinal@ approval, his testimony establishes the
impossibility of performance.  

We have already determined that the trial court did
not err in refusing to consider 
Anthamatten=s deposition testimony from a separate federal
proceeding.  With respect to the Anewly-discovered@
evidence of Moseley=s deposition testimony, appellant points to Moseley=s testimony that he may have asked the Corps to be
strict in its interpretation of the permit requirements.  Appellant also notes a contact report from
May 14, 1999, reflecting a phone conversation between Lynnda Kahn, Moseley=s employee, and Pat Clement with the Fish and
Wildlife Service.  The report provides:

Purpose: To see where things stand w/ yall regarding
the Commodores Cove [the property at issue] mitigation?  What if we were to send you a letter stating
that the algal flats have now become mostly vegetated, and that there are very
little unvegetated sandflats remaining as well If we ask for your input
regarding impacts to threatened & endangered species specifically the
piping plover, could you then get something to the USCE?

 








Response: Our hands are pretty much tied unless we
get something in writing from the USCE requesting that we re-initiate
consultation . . . If we were to receive a request from y=all we would respond in writing & at same time
we could copy the USCE & state our concerns w/ possibility that we could
even request informal if not formal consultation.  

 

A party seeking a new trial on the ground of
newly-discovered evidence must satisfy the court that (1) the evidence came to
his knowledge since the trial, (2) it was not because of lack of due diligence
that it did not come sooner, (3) the new evidence is not cumulative, and (4)
the new evidence is so material that it would probably produce a different
result if a new trial was granted.[46]  The trial court has wide discretion in ruling
on a motion for new trial, and its action will not be disturbed on appeal
absent a showing of an abuse of discretion.[47]

Here, the Anewly-discovered@
evidence shows only that Schexnailder was in communication with the Corps with
regard to the status of the mitigation work. 
We conclude that the evidence is not so material that it would probably
produce a different result if a new trial was granted.[48]  We overrule appellant=s fifth issue.

Having overruled all of appellant=s issues, we AFFIRM the trial court=s judgment.                                                                                       

_______________________

LINDA REYNA YAÑEZ,

Justice

 

Memorandum Opinion delivered and 

filed this the 23rd day of March, 2006.       











[1] Appellant is William C. Cocke, individually and in the right of Seashore Properties, Inc. 





[2] Individually and as officer and
director of Seashore Properties, Inc.





[3] Executor of the estate of C. Bert
Williams.





[4] Williams died in 1997.  Thereafter, his interest in the underlying
litigation has been represented by the executor of his estate, Chase Bank.  





[5] See Tex. Rev. Civ. Stat. Ann. art. 5.14 (Vernon 2003).





[6] See id. art. 5.14(I)
(providing that a derivative proceeding may not be discontinued or settled
without approval of the court). 
Appellees= motion urged that the Agreement
required court approval pursuant to former rule of civil procedure 42(a), which
provided, in pertinent part, that a derivative suit shall not be dismissed or
compromised without the approval of the court. 
In 2003, rule 42 was amended and the 
paragraph in subdivision (a) concerning 
derivative suits was deleted because it was redundant of article
5.14(I).  See Tex. R. Civ. P. 42  cmt.





[7] Specifically, in his report, the
Special Master found that paragraph 4 of Exhibit AA@ of the Agreement required
appellant to 

 

assume all liabilities and
obligations connected or related to the real property described in Exhibit AB@ of the Settlement Agreement, and
such obligations include, but are not limited to, environmental mitigation
required in U.S. Army Corps of Engineers Permit 9009(10) and that such
mitigation shall be in the manner and within the time prescribed by Permit
9009(10).

 

Paragraph 4 of Exhibit AA@ of the Agreement provides:

 

4. 
In consideration of the property and stock conveyed in Paragraph 1 and 2
above, William C. Cocke and Seashore Properties, Inc. agree to assume all
liabilities and obligations connected or related to ownership of the real
property thereof, including but not limited to Corp [sic] of Engineer permits,
and Environmental Mitigation, as worded in Westinghouse transfer of this real
property.

 

Exhibit AB,@ attached to the Settlement
Agreement, is a map depicting a planned development.

 

In his April 27, 1998
motion, appellant argues that the Areal property thereof@ referenced in paragraph 4 of Exhibit AA@ is Aa portion of the property known as
Commodore=s Cove and portions of Fairway
Estates.@ 
Appellant argues that the only mitigation required prior to the
development of  Commodore=s Cove is mitigation of Aup to six acres of seagrass
habitat.@ 
In support, appellant points to a fifteen-page Corps of Engineers
document dated November 2, 1994, outlining modifications to Permit No.
9009(09).





[8] The only dispute between the
parties regarding the language of the order was appellant=s desire to  include a sentence stating, A[i]f the mitigation is not done,
the Court will not approve the settlement agreement and not release the
documents and a trial will be set.@  Appellees opposed
inclusion of the sentence on grounds that it suggests that there was no
agreement.  The sentence was not included
in the order.  In announcing the decision
to omit the sentence, the trial court stated, AI think the remedies will be what
the parties will have if there is a breach of the settlement agreement and that
will be the remedies at law that each would be entitled to do, or have the
right to do.@  






[9] At the September 2, 1998, hearing,
appellant=s counsel and his contractor told
the court that Mark King of the Corps of Engineers was monitoring the project Aon a daily basis.@ 
At a hearing on January 21, 2000, appellant admitted that he Anever saw the Corps on the job site
ever@ and that the Corps Anever even checked the work while
we were under construction, and for six months after the work was over with,
they never even came out and looked at it because they relied on Mr. Williams.@ 






[10] Schexnailder was not consulted
regarding the modifications to the permit plans.  





[11] In support of his assertion,
appellant attached a copy of the November 19, 1998 letter from the Corps.  





[12] Because the hearing took place on
December 22, 1998, we assume the trial court=s order appointing the Special Master was issued January
13, 1999.  





[13] At the July 13, 1999 status
hearing, the Special Master announced that he intended, at the trial court=s direction, to address the issue
of Asubstantial compliance.@ 
Appellees filed objections to the inclusion of Asubstantial compliance@ as an issue before the Special
Master.





[14] On December 6, 2000, appellees
filed objections to appellant=s first and second affidavits.  Appellees objected to both affidavits on numerous
grounds, including that (1) neither affidavit positively avers that the
statements contained therein are true and correct; (2) the statements are
unsubstantiated and unqualified legal opinions or conclusions; and (3) the
statements are unsubstantiated factual opinions or conclusions.  The trial court=s order granting summary judgment
in appellees= favor states that appellees= objections to appellant=s summary judgment evidence are Awell taken and are hereby
SUSTAINED.@





[15] At the conclusion of the hearing,
the trial court denied appellant=s motion to set aside the Agreement. 





[16] After the order granting summary
judgment, appellees= remaining claims were non-suited
and claims asserted by Intervenor W. T. Young were severed.  





[17] On August 23, 2002, appellant
filed another Motion for New Trial, attaching the Anewly-discovered@ evidence of the deposition of Fred
Anthamatten, a representative of the Corps, taken in a separate federal court
proceeding to which appellee Chase Bank was not a party.  Appellees objected to the trial court=s consideration of the
deposition.  The court sustained the
objections and denied appellant=s motion for new trial.  






[18] See Tex. R. Civ. P. 166a(i), (c); see also Ortega v. City
Nat'l Bank, 97 S.W.3d 765, 771 (Tex. App.BCorpus Christi 2003, no pet.) (op.
on reh'g). 





[19] Ortega, 97 S.W.3d at 772. 





[20] See Tex. R. Civ. P.  166a(c); Nixon v. Mr. Prop. Mgmt. Co.,
690 S.W.2d 546, 548 (Tex. 1985); see also Ortega, 97 S.W.3d at 771. 





[21] 
Ortega, 97 S.W.3d at 771. 





[22]  Id. 





[23] Id. at 772.  





[24] 
 Id. 





[25] Tex. R.
Civ. P. 166a(i).





[26] Ortega, 97 S.W.3d at 772. 





[27] Id. (quoting Kindred v.
Con/Chem Inc., 650 S.W.2d 61, 63 (Tex. 1983)). 





[28] 
Id. (citing Transp. Ins. Co. v. Moriel, 879 S.W.2d 10, 25
(Tex. 1994)). 





[29] Tex.
R. Civ. P. 166a(i).





[30] See Tex. R. Civ. P. 166a(c).





[31] Keszler v. Mem=l Med. Ctr. of E. Tex., 105 S.W.3d 122, 128
(Tex. App.BCorpus Christi 2003, no pet.). 





[32] Meek v. Bishop Peterson & Sharp, P.C., 919 S.W.2d 805, 808 (Tex. App.BHouston [14th Dist.] 1996, writ
denied).   





[33] See Ortega, 97 S.W.3d at
772. 





[34] Patel v. Ambassador Drycleaning
& Laundry Co., Inc., 86 S.W.3d 304, 309 (Tex. App.BEastland 2002, no pet.). 





[35] Smith v. Smith, 112 S.W.3d
275, 279 (Tex. App.BCorpus Christi 2003, no pet.). 





[36] Id. 





[37] O. W. Grun Roofing &
Constr. Co. v. Cope, 529 S.W.2d 258, 261 (Tex. Civ. App.BSan Antonio  1975, no writ). 





[38] 
Id. 





[39] Tex.
R. Civ. P. 166a(c); Trico Techs. Corp. v. Montiel, 949 S.W.2d
308, 310 (Tex. 1997). 





[40] Ryland Group, Inc. v. Hood,
924 S.W.2d 120, 122 (Tex. 1996).





[41] Tex. Div.‑Tranter, Inc.
v. Carrozza, 876 S.W.2d 312, 314 (Tex. 1994); Allied Chem. v. DeHaven,
752 S.W.2d 155, 158 (Tex. App.BHouston [14th Dist.] 1988, writ denied).





[42] See Allied Chem.,
752 S.W.2d at 158.





[43] Id. 





[44] Mustang Pipeline Co. v. Driver
Pipeline Co., 134 S.W.3d 195, 196 (Tex. 2004). 





[45] Hernandez v. Gulf Group Lloyds,
875 S.W.2d 691, 692-93 (Tex. 1994).  





[46] Jackson v. Van Winkle, 660
S.W.2d 807, 809 (Tex. 1983); Lopez v. Lopez, 55 S.W.3d 194, 202 (Tex.
App.BCorpus Christi 2001, no pet.).





[47] In re Bayerische Motoren Werke, 8 S.W.3d 326, 327 (Tex. 2000); Lopez,
55 S.W.3d at 202.

 





[48] See Lopez, 55 S.W.3d at
202.